IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| FERRELLGAS PARTNERS L.P., FERRELLGAS, L.P., BRIDGER LOGISTICS, LLC, BRIDGER ADMINISTRATIVE SERVICES II, LLC, BRIDGER LAKE, LLC, BRIDGER LEASING, LLC, BRIDGER MARINE, LLC, BRIDGER RAIL SHIPPING, LLC, BRIDGER REAL PROPERTY, LLC, BRIDGER STORAGE, LLC, BRIDGER TERMINALS, LLC, BRIDGER TRANSPORATION, LLC, BRIDGER SWAN RANCH, LLC, BRIDGER ENERGY, LLC, J.J. ADDISON PARTNERS, LLC, AND J.J. LIBERTY, LLC, | § § § § § § § § § § § § § § § § § § § | No. 183, 2023 Court Below: Superior Court of the State of Delaware C.A. No. N19C-05-275 |
| Plaintiffs-Below, Appellants, | § § | |
| v. | § § | |
| ZURICH AMERICAN INSURANCE COMPANY, | § § § | |
| Defendant-Below, Appellee. | § § § | |

Submitted:  March 27, 2024
Decided:    June 10, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, and **GRIFFITHS**, Justices.

Upon appeal from the Superior Court.  **AFFIRMED**.

David J. Baldwin, Esquire, Peter McGivney, Esquire, Berger Harris LLP, Wilmington, Delaware. *Of Counsel:*  Brent W. Vincent, Esquire (*argued*), Bryan Cave Leighton Paisner LLP, Chicago, Illinois *for Plaintiffs-Below, Appellants.*

Bruce W. McCullough, Esquire, Bodell Bove, LLC, Wilmington, Delaware.  *Of Counsel:* Louis A. Bové, Esquire (*argued*), Bodell Bove, LLC, Philadelphia, Pennsylvania *for Defendant-Below, Appellee.*

**VALIHURA**, Justice:

*INTRODUCTION*

This is an appeal of a January 21, 2020 Opinion of the Superior Court (the "2020 Opinion") which denied a Motion for Summary Judgment brought by Appellants, Ferrellgas Partners L.P. and Ferrellgas, L.P. (collectively "Ferrellgas") et al.,[1] which sought declaratory relief obligating Appellee, Zurich American Insurance Company ("Zurich") to advance defense costs for underlying litigation pursuant to an insurance policy it issued to Ferrellgas.

Ferrellgas appeals the 2020 Opinion arguing that the Superior Court erred by holding that Zurich has no duty to advance defense costs for Ferrellgas' underlying litigation because the First Amended Complaint of Eddystone Rail Company, LLC ("Eddystone," the plaintiff in the underlying litigation) did not allege loss which falls within the scope of coverage of the claims-made insurance policy that Zurich issued to nonparty Bridger, LLC. The overall gravamen of Ferrellgas' argument is that the Eddystone Litigation is a claim for wrongful acts occurring before June 24, 2015, a date contained in a key coverage exclusion which provides that Zurich has no duty advance defense costs for claims arising from wrongful acts occurring after June 24, 2015.

Analysis of the issue of whether Zurich must advance defense costs can be summarized into two steps: first, the meaning of the pertinent provisions in Zurich's

---

[1] The remaining Appellants, who are omitted from the text above for the sake of brevity are Bridger Logistics, LLC; Bridger Administrative Services II, LLC; Bridger Lake, LLC; Bridger Leasing, LLC; Bridger Marine, LLC; Bridger Rail Shipping, LLC; Bridger Real Property, LLC; Bridger Storage, LLC; Bridger Terminals, LLC; Bridger Transportation, LLC; Bridger Swan Ranch, LLC; Bridger Energy, LLC; J.J. Addison Partners, LLC; and J.J. Liberty, LLC.

insurance policy (the "Zurich Policy") must be ascertained to define the scope of the policy's coverage. Second, the nature of the claims in the underlying litigation must be analyzed with reference to the Zurich Policy.

The first step, the plain meaning of the Zurich Policy itself, finds support in caselaw construing similar policy language and indicates that the Zurich Policy obligates Zurich to advance defense costs only for claims arising from wrongful acts which took place before June 24, 2015. With respect to the second step, Eddystone's First Amended Complaint, which underpins the Eddystone Litigation, and when read as a whole, states a claim for relief from a wrongful act — a breach of contract — occurring after June 24, 2015, consequently absolving Zurich from any obligation to advance. Accordingly, we AFFIRM the decision of the Superior Court.

Zurich also brings a cross-appeal, arguing that Ferrellgas' appeal of the 2020 Opinion is untimely. Zurich contends that the 2020 Opinion, and its declaration of no coverage dispositively defined the rights between Ferrellgas and Zurich, and left nothing to be resolved as to them. Zurich further contends that the Superior Court's approval of a Joint Stipulation of dismissal between Ferrellgas and Beazley Insurance Company Inc. ("Beazley") then resulted in all claims being resolved as to all parties. Ferrellgas' position is that the final judgment in this matter is the order by the Superior Court dated May 10, 2023,[2] which states explicitly that it is a final judgment. Delaware law requires timely

---

[2] The Superior Court entered judgment on May 9, 2023. However, its order entering judgment is dated May 10, 2023. This distinction does not affect our analysis. *See* B0892 (Order Entering Judgment).

appeal within thirty days of the entry of final judgment, and because Zurich maintains that final judgment occurred no later than November 10, 2021, it argues that Ferrellgas' May 25, 2023 appeal is untimely. For the reasons explained below, we conclude that Ferrellgas' appeal is timely.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Eddystone Litigation

On February 2, 2017, Eddystone filed a complaint in the United States District Court for the Eastern District of Pennsylvania against Appellants Ferrellgas, Bridger Logistics, LLC, and nonparties Julio Rios and Jeremy Gamboa.[3] In a subsequent amended complaint filed on September 7, 2018, (the "Eddystone FAC") a number of current and former direct or indirect subsidiaries were named as additional defendants, including Bridger Administrative Services II, LLC; Bridger Lake, LLC; Bridger Leasing, LLC; Bridger Marine, LLC; Bridger Rail Shipping, LLC; Bridger Real Property, LLC; Bridger Storage, LLC; Bridger Terminals, LLC; Bridger Transportation, LLC; Bridger Swan Ranch, LLC; Bridger Energy, LLC; J.J. Addison Partners, LLC; and J.J. Liberty, LLC.[4] The allegations contained in the Eddystone Litigation are critical in resolving the coverage issue.

To understand the nature of the Eddystone Litigation more fully, we explain the relationship among the parties involved. Julio Rios & Jeremey Gamboa ("Rios" and

---

[3] A0247 (Civil Cover Sheet).

[4] A0275 (Eddystone FAC at 1). The case is captioned *Eddystone Rail Co., LLC v. Bridger Logistics, LLC et al.*, No. 2:17-cv-00495 (E.D. Pa.).

"Gamboa" respectively) are former directors of a crude oil trading and logistics business.[5] This business involves many "nominally different" entities created by Rios and Gamboa with the name "Bridger," with each entity responsible for different attributes of the process of transporting crude oil from wellheads to end markets in North America. The entities include Bridger, LLC; Bridger Marketing, LLC; Bridger Logistics, LLC and its subsidiaries (these three entities and the following are hereinafter referred to collectively as the "Bridger Group") Bridger Administrative Services II, LLC; Bridger Marine, LLC; Bridger Rail Shipping, LLC; Bridger Real Property, LLC; Bridger Storage, LLC; Bridger Swan Ranch, LLC; Bridger Terminals, LLC; Bridger Transportation, LLC; Bridger Energy, LLC; Bridger Leasing, LLC; Bridger Lake, LLC; Bridger Administration; Bridger Management; J.J. Liberty, LLC; J.J. Addison Partners, LLC; and Bridger Transfer Services.[6] The members of the Bridger Group operated in concert and without inter-company contracts defining their relationship. They were "all headed by the very same people[,] and shared employees."[7]

---

[5] *See* A0282 (Eddystone FAC at ¶ 33).

[6] The following entities are identified as the "Fraudulent Transfer Recipient Subsidiaries": Bridger Administrative Services II, LLC; Bridger Marine, LLC; Bridger Rail Shipping, LLC; Bridger Real Property, LLC; Bridger Storage, LLC; Bridger Swan Ranch, LLC; Bridger Terminals, LLC; Bridger Transportation, LLC; Bridger Energy, LLC; Bridger Leasing, LLC; Bridger Lake, LLC; Bridger Administration; Bridger Management; J.J. Liberty, LLC; and J.J. Addison Partners, LLC [hereinafter the "Fraudulent Transfer Recipient Subsidiaries"]. A0369 (Answer to First Amended Complaint, Affirmative Defenses, and Counterclaims of Defendant Zurich Am. Ins. Co., at ¶ 34 n.1).

[7] A0282 (Eddystone FAC at ¶ 33).

The companies within the Bridger Group that are most relevant to the Eddystone Litigation are Bridger Logistics, LLC ("Bridger Logistics"), Bridger Transfer Services, LLC ("BTS"), and Bridger Marketing. Bridger Logistics provided entities which transported crude oil, known as "shippers," with the necessary arrangements to do so. BTS handled the specific process of "transloading," that is, transferring cargo from one mode of transportation to another.[8] Bridger Marketing handled the facilitation of agreements between outside clients and the Bridger Group.[9] In its complaint, Eddystone pointed out that, as the sole member of an LLC like BTS, Bridger Logistics "owned all of BTS'[s] equity and controlled all of BTS'[s] decision-making."[10]

In 2013, the price of crude oil from North Dakota wellheads was substantially lower than the "Brent benchmark."[11] Under these circumstances, crude oil logistics firms could profit on transporting and selling North Dakota crude notwithstanding its transport cost.[12] The Bridger Group knew that it could capitalize on this development by providing the means to transport crude oil to refineries along the Delaware river.[13] To do this, Bridger

---

[8] A0283 (Eddystone FAC at ¶ 36). In this case, transloading entailed transferring crude oil from railcars to barges. *Id.*

[9] *See* A0284–A0285 (Eddystone FAC at ¶¶ 40–41) (Bridger Marketing was responsible for entering into the 2014 Crude Oil Supply Agreement with Monroe Energy, LLC. Bridger Marketing was also responsible for brokering agreements to acquire crude oil from wellheads).

[10] A0282 (Eddystone FAC at ¶ 34).

[11] The "Brent" benchmark is one of the leading metrics for oil prices and is "used to price over three-quarters of the world's traded oil[.]" Mike Wittner, *Brent™ the world's crude benchmark*, ICE (Sept. 2020), https://www.ice.com/insights/market-pulse/brent-the-worlds-crude-benchmark.

[12] A0276–A0277 (Eddystone FAC at ¶ 4).

[13] *See* A0283 (Eddystone FAC at ¶¶ 35–36).

Logistics would need access to a transloading facility.[14]  Consequently, Bridger Logistics requisitioned BTS to enter into a contract with Eddystone, which the parties entitled the "Eddystone Rail Facilities Services Agreement" ("RSA").

Under the RSA, Eddystone spent over $170 million constructing a transloading facility which transferred crude oil from railcars to river barges, and the facility was for the exclusive use of BTS.[15]  For its part, BTS promised to bring a total of 118,168,750 barrels of crude oil to the Eddystone transloading facility — a minimum of 64,750 barrels of crude oil per day — from the date of the facility's completion on April 17, 2014, to June of 2019.[16] Each transloaded barrel would cost BTS $2.25, and if BTS could not meet the quota, it was required to make a deficiency payment to Eddystone of $1.75 for however many barrels that were below the minimum.

"Touting" Bridger Logistics' newfound exclusive transloading ability through the agreement between BTS and Eddystone, Bridger Marketing was able to secure a deal with Monroe Energy, LLC ("Monroe"), an owner/operator of an oil refinery located in Trainer, Pennsylvania in July of 2014.[17]  This agreement, the Crude Oil Supply Agreement or "COSA," obligated Monroe to make an undifferentiated payment to both Bridger Marketing and Bridger Logistics for the acquisition of 1.95 million barrels of crude oil per

---

[14] A0283 (Eddystone FAC at ¶ 36).

[15] A0276 (Eddystone FAC at ¶¶ 3–4).

[16] A0283–A0284 (Eddystone FAC at ¶¶ 37–39).

[17] A0284 (Eddystone FAC at ¶ 39).

7

month from July of 2014 to June of 2019.[18] On the other side of the deal, Bridger Marketing was to acquire the crude oil to be sold to Monroe, then Bridger Logistics and its subsidiaries were responsible for transporting the oil to Monroe.[19]

BTS and the RSA with Eddystone constituted a critical step in this arrangement. Indeed, transloading was essential to fulfill the COSA with Monroe, yet BTS's ability to uphold the RSA depended on Bridger Logistics. As discussed, BTS was obligated to make certain payments to Eddystone under the RSA.[20] To meet this, Bridger Logistics and its affiliates credited BTS a portion of the funds from Monroe and the COSA — just enough to pay Eddystone.[21] Without this source of revenue, BTS would have been unable to independently pay Eddystone.[22] Eddystone, in its complaint, alleged that BTS's financial dependence on other members of the Bridger Group, like Bridger Logistics, was misrepresented to the extent that the defendants "held out to Eddystone that BTS was an independent, bona fide company with substantial operations in addition to the RSA[,]"[23] when, in fact, it was not.[24]

---

[18] A0284 (Eddystone FAC at ¶ 40).

[19] A0285 (Eddystone FAC at ¶ 41).

[20] A0283–A0284 (Eddystone FAC at ¶ 37).

[21] A0286 (Eddystone FAC at ¶ 47).

[22] *See* A0286–A0287 (Eddystone FAC at ¶ 49).

[23] A0285 (Eddystone FAC at ¶ 42).

[24] *See* A0278 (Eddystone FAC at ¶ 9) ("BTS was in fact not the independent bona fide entity that Defendants held out. Contrary to Defendants' holding out of BTS, it was an entirely captive instrument of Defendants, without operational or financial independence.").

The crude oil transport arrangement involving the Bridger Group, Eddystone, and Monroe carried on as planned for a time, but in May of 2015, and through June of the same year, Appellants Ferrellgas acquired Bridger Logistics (and its subsidiaries, including BTS).[25] Rios and Gamboa joined Ferrellgas as its management team for Bridger Logistics.[26]

Then in the fall of 2015, oil prices changed resulting in the COSA operation becoming unprofitable.[27] As a result, the days of COSA seemed numbered.[28] However, even if COSA ended, BTS, and by extension Bridger Logistics and Ferrellgas, would still be obligated to meet the minimum monthly volume deficiency payment commitments to Eddystone under the RSA. Seeing the proverbial writing on the wall, Ferrellgas and Bridger Logistics are alleged to have developed a plan to "wind down" the operation with Monroe while simultaneously insulating themselves from their obligations under the RSA.[29] Eddystone alleged the plan consisted of the following four steps:

> 65. Between late May 2015 and January 2016, Defendants Rios, Gamboa, Bridger Logistics, and [Ferrellgas] stripped BTS of assets, including cash flows, and caused BTS to operate as little more than a liability shield for other [Ferrellgas] entities. First, the Monroe revenues that had previously been credited to BTS were redirected to other [Ferrellgas] entities, including Bridger Logistics and Bridger Rail Shipping – and ultimately passed up to [Ferrellgas]. Bridger Logistics and Bridger Rail Shipping began making payments directly to Eddystone on the RSA.

---

[25] A0287 (Eddystone FAC at ¶ 50).

[26] A0288 (Eddystone FAC at ¶ 53).

[27] A0290 (Eddystone FAC at ¶ 61).

[28] *See* A0290–A0291 (Eddystone FAC at ¶ 64).

[29] *Id.*

9

66. Second, throughout this period BTS engaged in a series of intercompany transactions by which it transferred substantial assets to Defendants Bridger Logistics, Bridger Administrative Services II, LLC, Bridger Rail Shipping, LLC, Bridger Real Property, LLC, Bridger Transportation, LLC, Bridger Energy, LLC, Bridger Leasing, LLC, Bridger Lake, LLC, Bridger Administration, Bridger Management, J.J. Liberty, LLC, and J.J. Addison Partners, LLC. [(collectively known as the "Fraudulent Transfer Recipient Subsidiaries")] . . . .

67. Third, BTS also transferred away all of its real and personal property and valuable commercial contracts to other [Ferrellgas] subsidiaries. For example, in January 2016, BTS transferred to Bridger Swan Ranch, LLC, a newly-formed [Ferrellgas] subsidiary, the Swan Ranch transloading facility with all of its transshipment infrastructure, including crude injection stations, a crude oil transmission pipeline, and associated fixtures, valued at $18.5–20 million. BTS also transferred to Bridger Swan Ranch, LLC, the associated throughput agreement with Shell that had $23.68 million remaining in fixed fees. BTS received no consideration. BTS granted Bridger Real Property, LLC, title to 15 acres of land in Laramie County, Wyoming for $10, though the land was valued by the county tax assessor at $950,000. BTS transferred tens of millions of dollars' worth of assets to Bridger Terminals, LLC, including land, injection stations, throughput agreements, and equipment, fixtures, and personal property for $10. BTS also allowed a blanket lien to be granted on its assets to secure loans made to [Ferrellgas].

68. Fourth, in January 2016, Defendants Rios, Gamboa, Bridger Logistics, and [Ferrellgas] caused BTS to forgive millions of dollars in accounts receivable that it was owed by other Bridger Logistics and [Ferrellgas] affiliates, including the Additional Fraudulent Transfer Recipient Subsidiaries.[30]

With the foregoing plan complete, BTS was thoroughly gutted, its value siphoned away, leaving little more than a corporate crash barrel set to absorb the impact of defaulting under the RSA while protecting Bridger Logistics and Ferrellgas. The transfers, Eddystone alleged, were fraudulent — made for virtually no consideration, and caused by, Ferrellgas,

---

[30] A0291–A0292 (Eddystone FAC at ¶¶ 65–68).

Bridger Logistics, Rios, and Gamboa who, Eddystone further alleged, were in complete control of BTS.[31] Ferrellgas, in the case at hand, refers to these transfers as the "Improper Transfer Acts."

On February 1, 2016, the amended COSA agreement was effectively ended.[32] The gutted BTS (later renamed "Jamex Transfer Services" but hereinafter still referred to as BTS) was sold for ten dollars to a new Ferrellgas subsidiary.[33] BTS never delivered another train of crude oil to Eddystone, and refused, in breach of the RSA, to make any more payments to Eddystone.[34] Eddystone was forced to suspend operations, and sought relief.

Eddystone filed a demand for arbitration with the Society of Maritime Arbitrators ("SMA") on April 19, 2016.[35] Eddystone achieved a settlement on January 5, 2017, wherein it was to receive deficiency payments that had accrued to that date as well as anticipatory deficiency payments in light of BTS's anticipatory breach of contract in the coming years. BTS, however, was insolvent. It had no money to make the deficiency payments, and so Eddystone filed the Eddystone Litigation which alleged four counts relying on theories of alter ego liability, intentional and constructive fraudulent transfer, and breach of the fiduciary duty of care and loyalty to creditors.[36] Eddystone also sought relief in the form of:

---

[31] A0297–A0298 (Eddystone FAC at ¶¶ 89–92).

[32] See A0292–A0293 (Eddystone FAC at ¶ 70).

[33] A0294 (Eddystone FAC at ¶ 73).

[34] A0294 (Eddystone FAC at ¶ 74).

[35] A0294 (Eddystone FAC at ¶ 75).

[36] See A0294–A0301 (Eddystone FAC at ¶¶ 76–103).

(1) An award of all payments BTS owes to Eddystone under the RSA[;] (2) An award against Defendants of all amounts awarded by the SMA arbitration panel in the arbitration between Eddystone and BTS[;] (3) All expectation damages available to a party injured by breach of contract at common law and by statute and such other and further relief as [the court] deems just and proper[;] (4) An order avoiding all direct or indirect transfers from BTS to Defendant transferees and requiring Defendant transferees to undo those transfers[;] (5) Damages in the amount of the value of the transfers[;] (6) An award of compensatory damages against Defendants for the economic injury they caused Eddystone through breach of their fiduciary duty in the amount of the foregone minimum volume payments owed under the RSA[;] (7) An award of punitive damages against Defendants for their intentional fraudulent transfer and their willful breach of fiduciary duty[;] and (8) Pre- and post-judgment interest . . . .[37]

The Eddystone Litigation was still pending at the time of oral argument before this Court.

## B. The Zurich Policy

On December 17, 2014, Zurich issued the Zurich Policy covering Bridger, LLC and, for the purposes of this appeal, its subsidiaries including Bridger Logistics and the Fraudulent Transfer Recipient Subsidiaries.[38]  The policy ran from December 17, 2014, to December 17, 2015 (the "Policy Period").[39]  It provided $10 million in coverage for "Management and Company Liability" in addition to a separate $1 million additional limit of liability for "Defense Costs."  The Zurich Policy covered all Loss sustained by the

---

[37] A0302 (Eddystone FAC "Prayer for Relief" at ¶¶ 1–8).

[38] *See* B0294 (Management and Company Liability Coverage Part [hereinafter "MC&L"], at Section III.D).  For the purposes of this appeal, the parties agree to assume, *arguendo*, that the named Defendants in the Eddystone Litigation qualify as insured subsidiaries under the Zurich Policy.  *See* Answering Br. at 17–18 n.4 ("For purposes of the instant appeal only, Zurich accepts Ferrellgas' contention that Bridger Logistics and the Fraudulent Transfer Recipient Subsidiaries qualify as **Subsidiaries** under the Zurich Policy and, consequently, qualify as **Insureds** under the definition of **Company**.") (emphasis in original).

[39] B0273 (Private Company Select Insurance Policy Declarations, at Item 3).

insured companies to the extent that the Loss was incurred due to a claim made against the insured companies during the Policy Period or during an extended Reporting Period or Run-Off Coverage Period if exercised for a Wrongful Act occurring before or during the Policy Period.[40] In other words, although the claim can be made during the Policy Period *or* the Run-Off Coverage Period, the Wrongful Acts which give rise to that Claim must have occurred before or during the Policy Period, but not during the Run-Off Coverage Period. As the policy text itself explains:

> The Underwriter shall pay on behalf of the **Company** all **Loss** for which the **Company** becomes legally obligated to pay on account of a **Claim** first made against the **Company** during the **Policy Period** or the **Extended Reporting Period** or **Run-Off Coverage Period**, if exercised, for a **Wrongful Act** taking place before or during the **Policy Period**, subject to the applicable Limits of Liability set forth in Items 2 and 6 of the Declarations.[41]

Although the foregoing text excludes from coverage losses from claims for wrongful acts occurring after the Policy Period and during the Run-Off Coverage Period, this notion was restated and clarified in the Run-Off Coverage Period endorsement section issued to Bridger, LLC when it opted to purchase Run-Off Coverage on June 24, 2015.[42] The pertinent text, hereinafter referred to as the "Run-Off Exclusion," states that Zurich shall not be liable for losses which occur as a result of claims for Wrongful Acts including any "Interrelated Wrongful Acts" which take place in whole or in part after the beginning of the Run-Off Coverage Period on June 24, 2015 ("the Run-Off Date"). It reads:

---

[40] *See* B0293 (MC&L, at Section I.C).

[41] *Id.* (emphasis in original).

[42] *See* B0378 (Run-Off Coverage Period Purchased by Policyholder Endorsement, at Section IV).

13

The Underwriter shall not be liable for **Loss** on account of, and shall not be obligated to defend, any **Claim** made against any **Insured** based upon, arising out of, or attributable to any **Wrongful Acts** including any **Interrelated Wrongful Acts**, taking place in whole or in part subsequent to 06/24/2015.[43]

Many important terms in the Zurich Policy are worth parsing out for the sake of clarity. As explained, the "**Company**" referenced in the policy text refers to Bridger, LLC and its subsidiaries which include Bridger Logistics and the Fraudulent Transfer Recipient Subsidiaries.

"**Loss**" is "the total amount the Insureds become legally obligated to pay on account of Claims made against them for Wrongful Acts for which coverage applies, including, but not limited to . . . Defense Costs[.]"[44]

"**Defense Costs**" are defined as "that part of Loss consisting of reasonable costs, charges, fees (including but not limited to attorney's fees and expert's fees) and expenses . . . incurred by the Insureds . . . in defending or investigating Claims . . . ."[45] Under the Zurich Policy, the policyholder may request the advancement of Defense Costs from Zurich, with the policy stating that "[t]he Underwriter shall advance Defense Costs within ninety (90) days after receipt from the Insured of invoices for such Defense Costs[.]"[46] Zurich's denial of Ferrellgas' request for such an advancement gave rise to the matter at hand.

---

[43] *Id.* (emphasis in original).

[44] B0295 (MC&L, at Section III.E) (emphasis removed).

[45] B0369 (Definition of Defense Costs Amended, at Section E) (emphasis removed).

[46] B0355 (Defense and Settlement Amended, at Section I.VII.A.1.c.iii) (emphasis removed).

A "**Claim**" is defined, in pertinent part, as "a civil proceeding against any Insured commenced by the service of a complaint or similar pleading[.]"[47]  Additionally, "[a]ll Claims under the Liability Coverage Parts which arise out of the same Wrongful Act and all Interrelated Wrongful Acts of Insureds shall be deemed one Claim, and such **Claim** shall be deemed to be first made on the date [of] the earliest of such **Claims** is first made against any **Insured**, regardless of whether such date is before or during the **Policy Period**."[48]

The "**Policy Period**" in this case, ran from December 17, 2014, to December 17, 2015.[49]

The "**Run-Off Coverage Period**" ( or "Run-Off Period"), is a "period of [] extended coverage" which may be purchased at the option of the insured.[50]  As mentioned, contemporaneously with Ferrellgas' acquisition of Bridger, LLC and its subsidiaries on June 24, 2015, Bridger, LLC purchased run-off coverage with a Run-Off Period which lasted from June 24, 2015 to June 24, 2021.[51]  The Run-Off Exclusion, contained within the endorsement for the Run-Off Period, explicitly excludes coverage of loss on account

---

[47] B0294 (MC&L, at Section III.A.2) (emphasis removed).

[48] B0285 (Private Company Select Insurance Policy Definitions, at Section III.D) (emphasis removed).

[49] B0273 (Private Company Select Insurance Policy Declarations, at Item 3).

[50] B0283 (Private Company Select Insurance Policy General Terms and Definitions, at Section II.AA).

[51] B0378 (Run-Off Coverage Period Purchased by Policyholder Endorsement, at Section III).

of claims arising out of any wrongful acts or interrelated wrongful acts taking place in whole or in part subsequent to the commencement of the Run-Off Date on June 24, 2015.[52]

> A "**Wrongful Act**" is defined as
>
> any error, misstatement, misleading statement, act, omission, neglect, or breach of duty actually or allegedly committed or attempted by any of the **Insured Persons**, individually or otherwise, in their capacity as such, or in an **Outside Position**, or with respect to Insuring Clause C, by the Company . . .[53]
>
> Finally, an "**Interrelated Wrongful Act**" is defined as "all Wrongful Acts that have

as a common nexus any fact, circumstance, situation, event, transaction, cause or series of causally connected facts, circumstances, situations, events, transactions or causes."[54]

To sum it up, the Zurich Policy provides coverage for any losses incurred because of a claim made against the insured,[55] who, in this case, is Bridger, LLC and its subsidiaries, including Bridger Logistics and the Fraudulent Transfer Recipient Subsidiaries.[56] The Eddystone Litigation counts as a claim made against the insured. The claim-related losses covered by the Zurich Policy include the defense costs for defending against claims.[57] Covered defense costs must be advanced upon the proper request of the insured, and

---

[52] B0378 (Run-Off Coverage Period Purchased by Policyholder Endorsement, at Section IV).

[53] B0296 (MC&L, at Section III.J.1) (emphasis removed).

[54] B0283 (Private Company Select Insurance Policy General Terms and Definitions, at Section II.R).

[55] *See* B0293 (MC&L, at Section I.C).

[56] *See* Answering Br. at 17–18 n.4.

[57] B0295 (MC&L, at Section III.E).

16

Bridger, LLC has properly requested the advancement of defense costs for the Eddystone Litigation.

There are two important limits to Zurich's obligation to advance defense costs.[58] First, the defense costs must be for claims which have been made during the Policy Period or during the Run-Off Period.[59] In this case, there is no dispute that the Eddystone Litigation is within these periods.[60] Second, the defense costs must be for claims based upon, arising out of, or attributable to wrongful acts, including any interrelated wrongful acts, which took place before the Run-Off Period which started on June 24, 2015.[61] If, in other words, the wrongful acts or interrelated wrongful acts which the claim is "based upon, arising out of, or is attributable to" take place in whole, or in part after June 24, 2015, Zurich has no obligation to cover the losses, including no obligation to advance defense costs.

---

[58] During the proceedings in the Superior Court, Zurich argued that Texas likely governed the issues in dispute, B453–B454 (Zurich Motion for Summary Judgment [hereinafter "Zurich MSJ"], at 14–15) (Sept. 18, 2019)), but the trial court found a choice of law analysis to be unnecessary because the parties agreed that the standards applicable to the issues here are largely the same under Delaware and Texas law. *Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 2020 WL 363677, at *3 (Del. Super. 2020). The Superior Court also observed that Delaware courts have held that Delaware law applies to disputes concerning D&O coverage where, as here, the insured companies are Delaware entities. Our Court recently reaffirmed this principle. *See, e.g., RSUI Indem. Co. v. Murdock*, 248 A.3d 887, 901 (Del. 2021) (holding that Delaware law applied to the interpretation of the D&O policy at issue and acknowledging, in balancing the California contracts, "Delaware's interest in protecting the ability of its considerable corporate citizenry to secure D&O insurance and thereby attract talented directors and officers[.]"). The parties have not raised any choice of law issues on appeal.

[59] *See* B0293 (MC&L, at Section I.C).

[60] *See* A0275 (Eddystone FAC at 1).

[61] *See* B0378 (Run-Off Coverage Period Purchased by Policyholder Endorsement, at Section IV).

## C. The Proceedings Below

After the operative complaint in the Eddystone Litigation was filed on September 7, 2018,[62] Ferrellgas provided Zurich timely notice of the Eddystone Litigation's commencement, and sought from Zurich the advancement of defense costs.[63] Zurich denied coverage.[64] Zurich explained that the reason for its denial was the fact that the underlying wrongful acts which gave rise to the claim in the Eddystone Litigation occurred after the commencement of the Zurich Policy's Run-Off Period on June 24, 2015.[65] Thus, due to the Run-Off Exclusion contained in the Zurich Policy, which worked to exclude advancement for claims arising from wrongful acts wholly or partially occurring after June 24, 2015, Zurich concluded that it had no obligation to advance defense costs for the Eddystone Litigation.[66]

In response, on July 1, 2019, Ferrellgas filed its First Amended Complaint ("Ferrellgas FAC") against Zurich and Beazley.[67] The complaint alleged breach of the insurance contract and sought a declaratory judgment as to the scope of insurance coverage. Specifically, the Ferrellgas FAC contained four counts. Counts I and II sought declaratory relief against Zurich and Beazley, respectively, for advancement of defense costs. Count III asserted a claim against Zurich for breach of its advancement and indemnification

---

[62] A0275 (Eddystone FAC).

[63] *See* A0841 (Ferrellgas FAC at ¶ 79).

[64] *See* A0841 (Ferrellgas FAC at ¶ 80).

[65] *See* A0841 (Ferrellgas FAC at ¶ 82).

[66] *See supra* Part I.B (explaining in detail the Zurich Policy and the Runoff Exclusion).

[67] A0821 (Ferrellgas FAC).

18

obligations. Count IV asserted a claim against Beazley for failing to indemnify Rios and Gamboa in the Eddystone Litigation.[68]

Zurich responded with a counterclaim on July 26, 2019, seeking a declaratory judgment that "Zurich has no coverage for any aspect of the Eddystone Litigation and has no obligation to defend, indemnify or pay any sums associated with the Eddystone Litigation[.]"[69] Both Zurich and Ferrellgas then moved for summary judgment, with Zurich requesting "judgment in its favor and a declaration that it has no insuring obligation in favor of the plaintiffs in this action relative to [the Eddystone Litigation] based on the [Run-Off Exclusion][.]"[70]

On January 21, 2020, the Superior Court granted Zurich's Motion for Summary Judgment.[71] Ferrellgas' argument to the Superior Court (which is substantially the same as its argument on appeal) relied on bifurcating the actions of Ferrellgas, Rios, Gamboa, Bridger Logistics, and the Fraudulent Transfer Recipient Subsidiaries into two separate and distinct categories of allegedly wrongful acts which allegedly occurred at different times.

Ferrellgas entitled the first category of wrongful acts the "Inducement Acts." The so-called Inducement Acts occurred around the time the RSA was being negotiated, between February of 2013 and April of 2014,[72] and consisted of certain statements in the

---

[68] A0850 (Ferrellgas FAC at ¶¶ 130–31).

[69] B0265 (Zurich Counterclaim for Declaratory Relief at 54).

[70] B0433 (Zurich MSJ).

[71] *Ferrellgas*, 2020 WL 363677, at *10.

[72] Opening Br. at 7.

Eddystone FAC which alleged that "Eddystone was induced to enter into the [RSA] with BTS in reliance on certain alleged misrepresentations and improper practices by Rios, Gamboa and [Bridger Logistics]."[73]  Specifically, Ferrellgas pointed to language in the Eddystone FAC which alleged that Bridger Logistics, Rios, and Gamboa held BTS out as a "bona fide company when it was [actually] undercapitalized and dominated by [Bridger Logistics][.]"[74]

Ferrellgas' second category of alleged wrongful acts, entitled the "Improper Transfer Acts," largely followed Ferrellgas' acquisition of Bridger, LLC on June 24, 2015 and culminated in the February 2016 breach.[75]  As the Superior Court observed, "[t]he RSA breach and the causally-related Transfer Acts purportedly occurred between May of 2015

---

[73] A0103 (Ferrellgas Opening Br. in Support of its Motion for Summary Judgment on Defense Costs [hereinafter "Ferrellgas MSJ Opening Br."] at 10).

[74] *Id.* (citing A0282–A0285 (Eddystone FAC at ¶¶ 33, 36, 38, 42, 44–45)).  Ferrellgas pointed to a few phrases which it suggests is evidence of Eddystone's Inducement Acts:  (1) Eddystone alleges that "Defendants Rios, Gamboa, and Bridger Logistics entered into negotiations with Eddystone to induce Eddystone to commit to building a facility[,]" A0283 (Eddystone FAC at ¶ 36), (2) the entirety of ¶ 42 of the Eddystone FAC which states "Defendants held out to Eddystone that BTS was an independent, bona fide company with substantial operations in addition to the RSA. Defendants represented that, as of December 31, 2014, BTS had total assets of $98.1 million, including shareholders' (members') equity of $37.9 million, including crude oil truck injection units, construction in progress, and receivables.  These numbers did not include any value for the RSA contract[,]" A0285 (Eddystone FAC at ¶ 42), (3) a statement that "[t]he course of dealing among the Bridger entities shows that they either operated with one another without regard to corporate entities or through a series of implied contracts[,]" A0285 (Eddystone FAC at ¶ 44), (4) another statement that "[u]ntil May 2015, Bridger Logistics affiliates received payments from Monroe under the COSA and paid BTS amounts sufficient to allow BTS to make all of the RSA payments due to Eddystone[,]" A0286–A0287 (Eddystone FAC at ¶¶ 47, 49), and (5) the conclusion stated in the alter ego count that "BTS was thus a façade for the operations of its 100% equity owner, Bridger Logistics, Bridger Logistics' control persons Rios, Gamboa, and [Ferrellgas], and Bridger Rail Shipping." A0296 (Eddystone FAC at ¶ 84).

[75] Opening Br. at 7–8.

and January of 2016."[76]  These acts consisted of the transfer of BTS property to Ferrellgas, Bridger Logistics, and the Fraudulent Transfer Recipient Subsidiaries.  They also consisted of BTS's debt forgiveness to the same.[77]

Ferrellgas made several assertions based on this bifurcated framework.  First, it contended that the two categories of wrongful acts were separate, and, in no way, were interrelated.[78]  It argued that the Eddystone FAC alleged multiple claims, with one being a sort of tacit fraudulent inducement claim which was evidenced by the inclusion of the Inducement Acts allegations.[79]  Because the Inducement Acts are supposedly independent of the Improper Transfer Acts and took place before June 24, 2015, the putative tacit claim arising from them would not be within the ambit of the Run-Off Exclusion, and advancement by Zurich would be required.[80]

Zurich responded that the Eddystone Litigation arose from the Improper Transfer Acts alone, which almost all occurred after the beginning of the Run-Off Period and thus, fall under the umbrella of the Run-Off Exclusion.[81]  The Eddystone Litigation is just one claim — a breach of contract claim — that was caused by the Improper Transfer Acts rendering BTS doomed to breach the RSA in February of 2016.[82]  To support this view,

---

[76] *Ferrellgas*, 2020 WL 363677, at *10 (internal citation omitted).

[77] *See id.*, at *5; *see also* A0291–A0292 (Eddystone FAC at ¶¶ 65–68) (alleging what Ferrellgas characterizes as the Improper Transfer Acts).

[78] *See Ferrellgas*, 2020 WL 363677, at *7.

[79] *Id.* at *6.

[80] *See* A0119–A0120 (Ferrellgas MSJ Opening Br. at 26–27).

[81] *Ferrellgas*, 2020 WL 363677, at *6.

[82] *Id.*

21

Zurich asserted that the four counts in the Eddystone FAC were parts of the single breach claim, and served as mechanisms by which Eddystone could receive damages and other relief from the breach.[83]  Zurich further argued that its single-claim characterization is bolstered by Eddystone's prayer for relief which seeks redress that is consistent with a breach of contract claim.

Next, turning to its argument regarding the so-called Inducement Acts, Zurich contended that the Inducement Acts nonetheless "cannot escape the Run-Off Provision" because:  (1) Eddystone did not allege a fraudulent inducement claim and therefore, under the Zurich policy, no advancement of defense costs is required; or, in the alternative, (2) the Inducement Acts constitute Interrelated Wrongful Acts related to the acts giving rise to the breach of contract claim, which is excluded by the Run-Off Exclusion.

The Superior Court substantially agreed with Zurich.  First, the Superior Court addressed whether the Inducement Acts gave rise to a unique claim which was independent from the breach of contract claim.  The Superior Court noted that, to determine what claims the Eddystone FAC actually alleges, it must look at the Eddystone FAC as a whole, and the reasonable inferences that may be drawn from them and is not bound by the Plaintiffs' characterization of its claims.[84]  Through this lens, the Superior Court determined that "all Claims in the FAC stem from the February 16, 2016 breach of the RSA."[85]  The Superior

---

[83] *Id.* ("The four 'Counts' listed in the FAC are:  (I) Alter Ego; (II) Intentional Fraudulent Transfer; (III) Constructive Fraudulent Transfer; and (IV) Breaches of Fiduciary Duties owed to Creditors.") (internal citation omitted).

[84] *See id.* at *9.

[85] *Id.* at *10.  Notably, in this sentence, the Superior Court used the word "Claims" plural to describe the contents of the Eddystone FAC.  However, later in the very same paragraph, the

22

Court also concluded that "[a]ll requested relief in the Eddystone FAC is in the nature of damages for breach of contract. Eddystone is not seeking reformation of the RSA or to set aside the RSA[,]" thus, "the Eddystone Litigation does not raise a Claim for damages based on fraud in the inducement, the Inducement Acts, or any damages separate and apart from the breach of contract claim."[86]

The Superior Court then analyzed the Zurich Policy. The Policy requires Zurich to pay for loss, including the advancement of defense costs, which the company becomes obligated to pay on account of a claim arising from wrongful acts. The Zurich policy does *not* require Zurich to pay for loss on account of wrongful acts alone. Indeed, the Superior Court noted that "[w]rongful Acts, absent a Claim causing Loss to the Insureds, do not trigger Zurich's duty to advance defense costs under any reasonable interpretation of the Zurich Policy."[87]

Additionally, the Superior Court observed that the Run-Off Exclusion of the Zurich Policy is "not fairly or reasonably susceptible to more than one meaning[,]" and that it "clearly and unambiguously excludes coverage for Wrongful Acts outside the policy period

---

Superior Court characterized the Eddystone FAC as asserting just one claim. *Id.* ("the Eddystone Litigation does not raise a Claim for damages . . . apart from the breach of contract *claim*.") (emphasis added). It is clear, though, that the Superior Court held that the Eddystone FAC did *not* allege an independent claim based solely on the Inducement Acts. *See id.* (holding that "[t]he court finds that the Eddystone Litigation does not raise a Claim for damages based on fraud in the inducement, the Inducement Acts, or any damages separate and apart from the breach of contract claim.").

[86] *Id.*

[87] *Id.* at *9.

23

and Extended Claims Period of December 17, 2014 to June 24, 2015."[88]  In other words, Claims which arose from wrongful acts occurring after June 24, 2015 are excluded from coverage.[89]

With these observations in mind, the Superior Court then evaluated the Eddystone Litigation as it related to the Zurich Policy.  The Superior Court found that "the Eddystone Litigation does not raise a Claim for damages . . . apart from the breach of contract claim."[90] The breach of contract claim is supported by the Improper Transfer Acts, which primarily took place between May of 2015 and January of 2016, with the alleged improper debt forgiveness taking place in January 2016, immediately preceding the breach.  These acts predominantly took place after June 24, 2015, which puts them and their concomitant breach claim firmly within the Run-Off Exclusion.[91]

---

[88] *Id.* at *10 (internal citation omitted).

[89] *Id.* ("Wrongful Acts are excluded which took place in whole or in part subsequent to June 24, 2015. The exclusion incorporates any Interrelated Wrongful Acts.").

[90] *Id.*

[91] *Id.* ("Thus, the Wrongful Acts which gave rise to the Claims based on that breach took place predominantly subsequent to the coverage expiration. The Run-Off Exclusion denies coverage for any Interrelated Wrongful Acts taking place in whole *or in part* subsequent to 06/24/2015.") (internal quotation marks and citation omitted) (emphasis in original).  The Superior Court never directly ruled on whether the Inducement Acts are interrelated to the Improper Transfer Acts, although the Superior Court did recount the parties' arguments on the subject. *See id.* at *7.  Later, the Superior Court noted that the "bulk" of the wrongful acts giving rise to the breach of contract claim took place after June 24, 2015.  *Id.* at *10.  Considering that the Improper Transfer Acts predominantly took place after the commencement of the Run-Off Exclusion, it is not unreasonable to assume that the other acts referred to by the Superior Court are the Inducement Acts.  Thus, we read the Superior Court to be saying that the Eddystone Litigation did not give rise to a "claim" for the Inducement Acts, and in any event, those acts are interrelated to the post-acquisition Wrongful Acts upon which the Claim is based.

24

In sum, the Superior Court concluded that the Run-Off Exclusion excludes coverage for the breach claim arising out of the Improper Transfer Acts and thus, the Eddystone Litigation is excluded from coverage. The Superior Court further concluded that Eddystone did not pursue a claim for the so-called Inducement Acts. Consequently, Ferrellgas' motion for summary judgment requiring Zurich to advance defense costs was denied, with the Superior Court specifically concluding in the following language:

> [T]he Eddystone Litigation is excluded from coverage by the Zurich Policy. Therefore, Zurich's Motion for Summary Judgment is hereby **GRANTED.** Plaintiffs' Motion for Partial Summary Judgment on Count I, duty to advance defense costs, is hereby **DENIED**, and Count I is hereby **DISMISSED**.[92]

The Superior Court also denied a motion for summary judgment submitted by Beazley, the only other party to the litigation,[93] and on November 10, 2021, the Superior Court approved a Joint Stipulation between Beazley and Ferrellgas, dismissing Ferrellgas' action as against Beazley *only*.[94]

With little further activity from Ferrellgas, over one year passed from the date of the Joint Stipulation, and over three years passed from the date of Superior Court's 2020 Opinion (on the Motions for Summary Judgment). Then, on March 2, 2023, Ferrellgas filed a Motion to Dismiss Count III of its own complaint (Ferrellgas' motion to dismiss

---

[92] *Id.* (emphasis in original).

[93] *Id.* at *13.

[94] B0836 (Stipulation of Dismissal as to Beazley Ins. Co., Inc. dated Nov. 10, 2021) ("[The Stipulating Parties] . . . hereby STIPULATE AND AGREE that the above-captioned action be dismissed as to Beazley only . . . . For avoidance of doubt, this stipulation applies to Beazley only.").

25

[hereinafter called the "Ferrellgas MTD"]).[95]  Under Delaware law, Ferrellgas can only appeal a final judgment.[96]  Ferrellgas contended that the 2020 Opinion only addressed Count I of the Ferrellgas FAC, and that Counts II and IV were resolved by the Joint Stipulation of November, 2021.[97]  This meant that Count III was still left unresolved.[98]  Ferrellgas contended that it was unlikely that the Superior Court could address Count III, which concerned Zurich's indemnification obligation, until the resolution of the ongoing Eddystone Litigation.[99]  Because Ferrellgas had exhausted the Zurich Policy limits, it wished to dismiss the allegedly still-pending Count III so that a final judgment could be reached — thus allowing Ferrellgas to appeal the denial of its motion for summary judgment with respect to Count I (Zurich's duty to advance defense costs).[100]

Zurich opposed the motion based on its assertion that there were no claims still pending before the Superior Court and that the 2020 Opinion was a final judgment.[101]  Nonetheless, on May 10, 2023, the Superior Court granted the Ferrellgas MTD.[102]  In its Order Entering Judgment, the Superior Court explicitly stated that with the dismissal of Count III, "[f]inal Judgment is hereby entered in [the Ferrellgas] action."[103]

---

[95] B0838 (Ferrellgas MTD).

[96] *See* 10 *Del. C.* § 148.

[97] *See* B0841–B0842 (Ferrellgas MTD at ¶¶ 9–10, 15).

[98] *See* B0842 (Ferrellgas MTD at ¶ 15).

[99] *See* B0842 (Ferrellgas MTD at ¶ 16).

[100] *See* B0843 (Ferrellgas MTD at ¶ 17).

[101] *See* B0844 (Ferrellgas MTD at ¶ 19).

[102] B0892 (Order Entering Judgment).

[103] *Id.*

With the putative final judgment entered, Ferrellgas brought the instant appeal on May 25, 2023, challenging the Superior Court's determination that Zurich had no duty to advance defense costs.[104]  Zurich then brought the instant cross appeal, appealing from the Superior Court's May 10, 2023 order.

## II. STANDARD OF REVIEW

The Court reviews both the matter on appeal and the matter on cross appeal — a grant or denial of a motion for summary judgment or dismiss — *de novo*.[105]  Further, we "review the interpretation of insurance contracts *de novo*."[106]

## III. ANALYSIS

### A. The Superior Court was Correct in Holding that Zurich has no Duty to Advance Defense Costs for the Eddystone Litigation

To determine whether an insurer has a duty to advance defense costs, Delaware courts examine "whether the allegations of the complaint, when read as a whole, assert 'a risk within the coverage of the policy.'"[107]  This analysis involves a two-part process.  First

---

[104] A1343 (Notice of Appeal).

[105] *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1130 (Del. 2020).

[106] *Id*. (citing *In re Verizon Ins. Coverage Appeals*, 222 A.3d 566, 572 (Del. 2019)).

[107] *Verizon Commc'ns, Inc. v. Illinois Nat'l Ins. Co.*, 2017 WL 1149118, at *7 (Del. Super. 2017) (quoting *Cont'l Cas. Co. v. Alexis I. duPont Sch. Dist.*, 317 A.2d 101, 103 (Del. 1974)), *rev'd and remanded on other grounds sub nom., In re Verizon Ins. Coverage Appeals*, 222 A.3d 566 (Del. 2019); *see also Seritage Growth Props., L.P. v. Endurance Am. Ins. Co.*, 2022 WL 18046813, at *4–*5 (Del. Super. 2022) (applying the duty to advance test as described).  Zurich argues that under Texas law, the duty to advance defense costs may not be limited to the four corners of the operative pleading.  Answering Br. at 27.  The Superior Court, citing to *IDT Corp. v. U.S. Specialty Ins. Co.*, 2019 WL 413692 (Del. Super. 2019), applied the test as articulated above by the Superior Court in *Verizon*.  Citing to *IDT*, the Superior Court stated that it "looks at the facts stated in the complaint as well as any causes of action, and may review the complaint as a whole and consider all reasonable inferences that may be drawn from the allegation therein."  *Ferrellgas*, 2020 WL 363677, at *9 (internal citation omitted).  This Court has acknowledged that the duties to defend

27

the meaning and scope of the policy must be ascertained. Second the allegations in the complaint must be read and applied to that policy. We conclude that Zurich owes no duty to advance defense costs for the Eddystone Litigation, because the latter is a claim seeking relief for BTS's February 2016 breach of the RSA which occurred after the Run-Off Date.

### 1. The Zurich Policy

The Zurich Policy covers loss, including defense costs, which the company becomes obligated to pay because of a claim for wrongful acts made against the company, as long as the wrongful acts take place before or during the Policy Period of December 17, 2014, to December 17, 2015.[108] In this case, it is undisputed that Bridger Logistics and its subsidiaries are insureds and that there has been loss in the form of defense costs on account of a claim brought against the insureds during the pertinent period. Thus, the pertinent question is whether the loss is excluded by the Run-Off Exclusion.

The Run-Off Exclusion extends the period under which a potential claimant can bring a covered claim but excludes from coverage any claim for wrongful acts or interrelated wrongful acts taking place in whole or in part after June 24, 2015.[109] It states:

> The Underwriter shall not be liable for Loss on account of, and shall not be obligated to defend, any Claim made against any Insured based upon, arising out of, or attributable to any Wrongful Acts including any Interrelated

---

and to advance are two distinct obligations. *See, e.g., Stillwater Mining Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa*, 289 A.3d 1274, 1281 n.34 (Del. 2023); *In re Viking Pump, Inc.*, 148 A.3d 633, 670 n.163 (Del. 2016). However, the parties have not seriously contended on this appeal that there are distinctions in the standards which are material to the resolution of the issues before this Court. *See* Answering Br. at 28; Reply Br. at 13–14.

[108] *See* B0293 (MC&L, at Section I.C); B0273 (Private Company Select Insurance Policy Declarations, at Item 3).

[109] B0378 (Run-Off Coverage Period Purchased by Policyholder Endorsement, at Section IV).

Wrongful Acts, taking place in whole or in part subsequent to 06/24/2015 [the beginning of the Run-Off Coverage Period].[110]

The Run-Off Exclusion's meaning is clear. If a claim arises from Wrongful Acts that take place either partially or completely after June 24, 2015, then the claim is excluded from coverage. The Run-Off Exclusion incorporates any Interrelated Wrongful Acts.

This construction of the Run-Off Exclusion is supported by other courts construing similar provisions. Zurich cites *Health Corp. v. Clarendon Nat'l Ins. Co.* as an example.[111] In *Health Corp*, Zurich offered a layer of D&O coverage to plaintiffs. There, as in this case, plaintiffs purchased a runoff provision from Zurich which stated:

> [Zurich] shall not be liable for Loss on account of any Claim based upon, arising out of, or attributable to any Wrongful Acts where all or any part of such acts were committed, attempted or allegedly committed or attempted subsequent to September 12, 2000.[112]

After a claim was brought against insured directors for wrongful acts they committed both before and after September 12, 2000,[113] plaintiffs sought coverage. The

---

[110] *Id.* (emphasis removed).

[111] Answering Br. at 31 (citing *Health Corp. v. Clarendon Nat'l Ins. Co.*, 2009 WL 2215126 (Del. Super. 2009)).

[112] *Health Corp.*, 2009 WL 2215126, at *6.

[113] *Id.* at *9. In *Health* the insured stipulated that the wrongful acts occurred both before and after the Run-Off date. *Id.* Ferrellgas argues that because the timeline of wrongful acts was stipulated, *Heath* is inapposite. *See* Reply Br. at 17. However, this difference is not relevant to the point Zurich is trying to make by citing *Health*. By citing to *Health*, Zurich seeks to illustrate the meaning and application of the Run-Off Exclusion's language. *See* Answering Br. at 34 ("This, again, reinforced the only plausible reading of the run-off endorsement and exclusionary language at issue in [*Health Corp.*] (and here); [*i.e.*], coverage is barred where the Claim arises from a Wrongful Act or Interrelated Wrongful Act which occurred, in whole or in part, after the run-off date") (emphasis removed).

29

court found that the run-off exclusion barred coverage.[114] The court observed that the run-off exclusion "may bar claims even where the underlying Wrongful Act was not entirely completed after the cut-off date."[115] The court held that the run-off exclusion "contains clear language that excludes claims 'arising out of' Wrongful Acts committed or allegedly committed, at least partially after September 12, 2000, regardless of whether certain acts in furtherance of the underlying conspiracy were committed before the cut-off date."[116] The *Health Corp.* court relied upon two other cases in reaching its result, namely, *Bainbridge Mgmt. LP v. Travelers Cas. & Sur. Co. of Am.*,[117] and *Champlain Enters., Inc. v. Chubb Custom Ins. Co.*[118] Both cases construed exclusion language similar to that in the case at hand.

In *Bainbridge*, the plaintiff sought coverage under a directors' and officers' liability insurance policy after the plaintiff pled guilty to a fraud scheme that ran from 1995 to December 2000.[119] The run-off exclusion in *Bainbridge*, which included the substantially similar "in whole or in part" phrase from the Run-Off Exclusion in the instant case, excluded coverage for "[l]oss including Defense Expenses for, any Claim made against any Insured . . . arising out of or in any way related to any Wrongful Act committed or

---

[114] *Health Corp.*, 2009 WL 2215126, at *14.

[115] *Id.* at *15.

[116] *Id.* at *16.

[117] 2006 WL 978880 (N.D. Ind. 2006).

[118] 316 F.Supp.2d 123 (N.D.N.Y. 2003).

[119] *Bainbridge*, 2006 WL 978880, at *3.

alleged to have been committed, in whole or in part, prior to October 6, 1998."[120]  Plaintiff argued that although the fraud scheme began prior to October 6, 1998, wrongful acts occurred far past that date, and because plaintiff had "wrongful act" coverage, the wrongful acts after October 6, 1998 ought to be covered.[121]  The *Bainbridge* court disagreed.  The policy in *Bainbridge*, like the policy in the case at hand,[122] was a claims-made insurance policy which "cover[ed] Loss resulting from Claims against the Insureds for Wrongful Acts, not the Wrongful Acts themselves."[123]  The claim arose from a fraud scheme occurring both before and after October 6, 1998, and the policy "exclude[d] coverage for Claims, in their entirety, that arise from or are related to any Wrongful Acts that occurred before that date."[124]  Thus, the claim was not covered.[125]

Similarly, in *Champlain*, the underlying lawsuit involved three broad counts — the third of which arose from the purchase, storage, and renovation of four WWII-era airplanes between 1994 and 2000.[126]  The policy in *Champlain* contained a prior acts coverage exclusion which provided that the insurer "shall not be liable for Loss on account of any Claim . . . based upon, arising from, or in consequence of Wrongful Acts or Interrelated

---

[120] *Id.*

[121] *See id.* at *4.

[122] Opening Br. at 1 ("Zurich issued a claims-made insurance policy to non-party Bridger, LLC[.]").

[123] *Bainbridge*, 2006 WL 978880, at *4.

[124] *Id.* (internal citation omitted).

[125] Appellants attempt to distinguish *Bainbridge* by arguing that the plaintiff there admitted when the Wrongful Acts occurred.  This argument is not persuasive because the court's holding in *Bainbridge* did not depend on the admission, but rather, on the language of the policy.

[126] *Champlain*, 316 F.Supp.2d at 125–26.

Wrongful Acts which were committed, attempted or allegedly committed or attempted in whole or in part prior to May 20, 1999."[127]  The plaintiff argued that it should be covered because part of the storage and renovation of the airplanes occurred after 1999.  The court disagreed.  Even though part of the renovation and storage occurred after 1999, "[a]ny portion of the alleged improper storage and renovation not explicitly covered by the exclusion most certainly arises from the portion that is covered[.]"[128]

With this helpful backdrop, we conclude that the way the Run-Off Exclusion factors into a coverage analysis is as follows:  For Zurich to be obligated to advance Defense Costs, the claim or claims in the Eddystone Litigation must arise out of Wrongful Acts which took place entirely before June 24, 2015.

Neither party, nor the Superior Court, maintains that the Run-Off Exclusion is ambiguous; however, Ferrellgas argues that the Run-Off Exclusion should, nonetheless, be construed in a way that permits coverage consistent with the Reasonable Expectations of the Insured doctrine ("REI Doctrine").[129]

Normally, unless a contract is found to be ambiguous, a court should interpret its language as it "would be understood by an objective, reasonable third party[,]"[130] and

---

[127] *Id.* at 127 (internal quotation marks omitted).

[128] *Id.* at 129.

[129] *See* Opening Br. at 37.

[130] *Salamone v. Gorman,* 106 A.3d 354, 367–68 (Del. 2014) (internal quotation marks and citation omitted).

ascribe to it its "ordinary and usual meaning."[131]  "[I]f the language is clear and unambiguous a Delaware court will not destroy or twist the words under the guise of construing them."[132]  However, "[b]ecause an insurance policy is an adhesion contract and is not generally the result of arms-length negotiation, courts have developed rules of construction which differ from those applied to most other contracts."[133]  In *State Farm Mut. Auto. Ins. Co. v. Johnson*,[134] this Court adopted the doctrine of reasonable expectations.  A fundamental premise of the doctrine is that "the policy will be read in accordance with the reasonable expectations of the insured 'so far as its language will permit.'"[135]

In *Hallowell*, we articulated the doctrine as follows:  "the Court will look to the reasonable expectations of the insured at the time when he entered into the contract if the terms thereof are ambiguous *or conflicting, or if the policy contains a hidden trap or pitfall, or if the fine print takes away that which has been given by the large print.*"[136]  We emphasized that "the doctrine is not a rule granting substantive rights to an insured when

---

[131] *AT&T Corp. v. Faraday Cap. Ltd.*, 918 A.2d 1104, 1108 (Del. 2007) (internal quotation marks and citation omitted).

[132] *Hallowell v. State Farm Mut. Auto. Ins. Co.*, 443 A.2d 925, 926 (Del. 1982).

[133] *Id*.

[134] 320 A.2d 345, 347 (Del. 1974).

[135] *Hallowell*, 443 A.2d at 927 (quoting *Johnson*, 320 A.2d at 347).

[136] *Hallowell*, 443 A.2d at 927 (emphasis added).  As we said in *Hallowell*, "we decline to extend the reasonable expectations doctrine as far as it has been taken in some other jurisdictions; to do so would, in our judgment, effectively overrule *Johnson* and almost a century of Delaware case law."  *Id.* (internal citation omitted).

there is no doubt as to the meaning of policy language."[137]

Ferrellgas argues that the Superior Court erred in stating "[t]he Court will *only* apply [the REI Doctrine] where the policy is ambiguous."[138]  We observe that in *Stoms v. Federated Serv. Ins. Co.*,[139] this Court did say, in speaking of the doctrine, that it "applies only after a determination that an insurance contract is ambiguous."[140]  But even assuming

[137] *Id.*

[138] *See Ferrellgas*, 2020 WL 363677, at *4 (internal citation omitted) (emphasis in original).

[139] 125 A.3d 1102, 1108 (Del. 2015).

[140] *Id*. (internal citation omitted).  *Hallowell* arguably held that the doctrine of reasonable expectations applied even to insurance policies that were unambiguous but which were otherwise "conflicting, or if the policy contain[ed] a hidden trap or pitfall, or if the fine print purport[ed] to take away what [was] written in large print."  *Hallowell*, 443 A.2d at 928.  Appellants cite *Med. Depot, Inc. v. RSUI Indem. Co.*, 2016 WL 5539879, at *7 (Del. Super. 2016), *abrogated on other grounds* by *First Solar, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 274 A.3d 1006 (Del. 2022), for the proposition that the doctrine may apply even where the insured's expectations contravene the unambiguous meaning of exclusionary clauses.  *See also* Roger C. Henderson*, The Doctrine of Reasonable Expectations in Insurance Law After Two Decades*, 51 OHIO ST. L.J. 823, 833 (1990) (quoting *Hallowell's* language above and stating that "it appears that the Delaware Supreme Court will recognize rights at variance with the unambiguous language of a policy.") (internal citation omitted).  Two subsequent cases decided by our Court, however, have interpreted *Hallowell* more narrowly.  Those cases, albeit without any in-depth analysis, limited the application of the doctrine to contracts involving ambiguity.  *See, e.g., Stoms*, 125 A.3d at 1108 ("But that [reasonable expectations] doctrine applies only after a determination that an insurance contract is ambiguous.") (internal citation omitted); *Derrickson v. Am. Nat'l Fire Ins. Co.*, 538 A.2d 1113, 1988 WL 5729, at *1 (Del. 1988) (TABLE) ("We agree with the Superior Court that if the language of a contract or policy of insurance is clear and unambiguous, there is no basis for judicial construction to determine its meaning . . . . Absent such ambiguity, there is no need, or authority, for a court to apply rules of construction which require an insurance contract to be construed in favor of the insured, or attempt to discern the reasonable expectations of the purchaser.").

Several states have confined the doctrine to contracts that are ambiguous.  *See, e.g., Liggatt v. Emps. Mut. Cas. Co.*, 46 P.3d 1120, 1128 (Kan. 2002) ("Consistent with the trial court's decision, the reasonable expectations of a party to a contract cannot be used to modify unambiguous contractual provisions."); *Thomas v. State Farm Fire and Cas. Co.*, 626 S.W.3d 504, 509 (Ky. 2021) ("[T]he reasonable expectations doctrine applies only to policies with ambiguous terms.") (internal quotation marks and citation omitted); *Nat'l Am. Ins. Co. v. New Dominion, LLC*, 499

that *Hallowell*'s arguably broader statement of the policy survives *Stoms'* arguably

narrower formulation of the doctrine, Ferrellgas does not frame its argument in terms of

P.3d 9, 16 (Okla. 2021) ("The reasonable expectations doctrine states that where an ambiguity in an insurance contract exists, it should be resolved in accordance with the reasonable expectations of the parties."); *Jenkins v. State Farm Mut. Auto. Ins. Co.*, 632 S.E.2d 346, 352 (W. Va. 2006) ("However, generally, [i]n West Virginia, the doctrine of reasonable expectations is limited to those instances . . . in which the policy language is ambiguous.") (internal quotation marks and citation omitted); *Harper v. Fid. and Guar. Life Ins. Co.*, 234 P.3d 1211, 1222 (Wyo. 2010) ("In order to state a claim under the 'reasonable expectations' doctrine, the plaintiff must show the subject contract is ambiguous as to the provision in dispute . . . . The doctrine will not be applied where the insurance contract is plain and unambiguous.").

However, other courts have construed the doctrine more broadly. *See, e.g., West v. Umialik Ins. Co.*, 8 P.3d 1135, 1138 (Alaska 2000) ("The court need not find the policy ambiguous, however, to construe it under the reasonable expectations doctrine.") (internal citation omitted); *Bailey v. Lincoln Gen. Ins. Co.*, 255 P.3d 1039, 1043 (Colo. 2011) ("In Colorado, there are two general circumstances where the doctrine of reasonable expectations renders exclusionary language unenforceable: (1) where an ordinary, objectively reasonable person would, based on the language of the policy, fail to understand that he or she is not entitled to the coverage at issue; and (2) where, because of circumstances attributable to an insurer, an ordinary, objectively reasonable insured would be deceived into believing that he or she is entitled to coverage, while the insurer would maintain he or she is not."); *Steeve v. IMT Ins. Co.*, 926 N.W.2d 561, 2018 WL 6338611, at *3 (Iowa Ct. App. 2018) (TABLE) ("The doctrine of reasonable expectations is applicable if the exclusion (1) is bizarre or oppressive, (2) eviscerates terms explicitly agreed to, or (3) eliminates the dominant purpose of the transaction.") (internal quotation marks and citation omitted).

Some courts have rejected the doctrine entirely. *See, e.g., Deni Assocs. of Florida, Inc. v. State Farm Fire & Cas. Ins. Co.*, 711 So.2d 1135, 1140 (Fla. 1998) ("We decline to adopt the doctrine of reasonable expectations."); *Wilkie v. Auto-Owners Ins. Co.*, 664 N.W.2d 776, 788 (Mich. 2003) ("[W]e hold that the rule of reasonable expectations has no application in Michigan, and those cases that recognized this doctrine are to that extent overruled.").

The doctrine has suffered from a lack of clear definition in many jurisdictions. *See e.g., Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1310 n.3 (3d Cir. 1994) (Judge Roth, in attempting to apply Pennsylvania's formulation of the doctrine, observed that "a considerable number of trees have been sacrificed in the name of reasonable expectations as the academic community has debated what reasonable expectations means, which courts have adopted the doctrine, and whether it is desirable for them to have done so."). We need not today definitively resolve the unsettled state of our Delaware case law because even applying *Hallowell'*s arguably broader formulation, as opposed to *Stoms*' narrower formulation, Ferrellgas would not prevail.

the doctrine's other triggering conditions (that is, conflict, pitfalls, or dubious fine print) and thus, we reject its argument on that basis. This is not a case where it can be fairly said that the other factors come into play — that is, there is no conflict, "hidden trap or pitfall." Nor is this a case where there is fine print which eviscerates rights conferred in large print. Accordingly, the doctrine of reasonable expectations affords Appellants no relief.

In an attempt to fit within the "conflicting language" part of the doctrine, Ferrellgas contends that the Run-Off Exclusion puts the Runoff Coverage at odds with the expectations of the insured because it is an additional expense which actually reduces coverage instead of expanding it.[141] Ferrellgas contends that if a group of wrongful acts occurred both within and outside the Policy Period and Runoff Coverage Period, then claims arising from those acts are excluded by the Runoff Exclusion. By contrast, if a customer never purchased a Runoff Coverage Period at all, then that group of acts *would* give rise to a covered claim because the claim would not be subject to the Runoff Exclusion. Thus, Ferrellgas contends that the Runoff Exclusion limits coverage for conduct previously covered without it. Because "'no one' purchasing the Run-Off Endorsement would intend to spend over $80,000, as Bridger, LLC, did, to eliminate existing coverage[,]" the provision is inconsistent with the reasonable expectations of the insured and must be reconstrued using the REI Doctrine.[142]

---

[141] *See* Opening Br. at 39 ("When read properly as a whole, the application of the Exclusion to the Run-Off Endorsement is irreconcilable with the coverage provided by the Zurich Policy, and the reasonable expectations of the insureds must be considered and the Zurich Policy construed in favor of coverage.").

[142] *See id.* at 39–40.

We see no "conflict" in the policy's language. Given that we have determined that the Eddystone FAC asserts a claim for relief from a Wrongful Act — breach of the RSA — occurring after June 24, 2015, and given that it does not give rise to a separate claim based upon the Inducement Acts, we see no conflict.

Moreover, the baseline Zurich policy, without Runoff Coverage, requires that a claim be brought against the insured *during* the Policy Period.[143] If a claimant had a claim for wrongful acts that occurred during the Policy Period, but filed the claim *after* the Policy Period had expired, then the insured would be uncovered under the baseline policy. However, if an insured purchased the Run-Off Coverage Period, the time during which a potential claimant could bring a covered claim is extended.[144] Although the claim must be for Wrongful Acts occurring before the Run-Off Coverage Period, a purchaser of the Run-Off Period would still derive additional benefit in that they would be covered for qualifying claims brought *after* the Policy Period has lapsed. Thus, the Run-Off Coverage Period allows coverage for a claim first made during the Run-Off Coverage Period, provided that the Claim does not arise out of Wrongful Acts or Interrelated Wrongful Acts which occurred, in whole or in part, after the Run-Off Dates.

### 2. The Eddystone Litigation Applied to the Zurich Policy

Having addressed the relevant provisions of the Zurich Policy, including the Run-Off Exclusion, the next step in the analysis is analyzing the Run-Off Exclusion in the

---

[143] *See* B0293 (MC&L, at Section I.C).

[144] *Id.* ("The Underwriter shall pay on behalf of the Company all Loss for which the Company becomes legally obligated to pay on account of a Claim first made against the Company during the Policy Period . . . or Run-Off Coverage Period . . . .") (emphasis removed).

context of the Eddystone Litigation. For Zurich to owe a duty to advance, the Eddystone FAC must assert a claim covered by the Zurich Policy. As noted above, the relevant inquiry is whether the complaint "when read as a whole, assert[s] 'a risk within the coverage of the policy.'"[145]

The Zurich Policy covers the risk of loss on account of a Claim.[146] A "Claim" is "a civil proceeding against any Insured commenced by the service of a complaint or similar pleading[.]"[147] We conclude that the Eddystone FAC, when read as a whole, sets forth a claim for relief arising from Wrongful Acts occurring in whole or in part after June 24, 2015 resulting in the breach of the RSA.[148] Zurich has no duty to advance defense costs for this claim.

Although other events are mentioned in the Eddystone FAC, the allegations as a whole weave a clear overarching narrative thread that culminates in the 2016 breach and the fallout it caused for Eddystone. The Eddystone FAC describes how Ferrellgas, Bridger Logistics, Rios, and Gamboa ("the Eddystone Defendants") had total control over BTS.[149] Seeking to take advantage of a lucrative opportunity to transport oil, the Eddystone

---

[145] *Verizon*, 2017 WL 1149118, at *7 (quoting *Cont'l Cas. Co.*, 317 A.2d at 105).

[146] *See* B0293 (MC&L, at Section I.C).

[147] B0294 (MC&L, at Section III.A.2) (emphasis removed).

[148] *See* Answering Br. at 35 ("The Eddystone Litigation undeniably arises out of – and is dependent upon – the breach, in February 2016, of the RSA."); *Ferrellgas*, 2020 WL 363677, at *10 ("Viewing the Eddystone FAC in the light most favorable to Plaintiffs, the Court finds that all Claims in the FAC stem from the February 16, 2016 breach of the RSA.").

[149] A0296 (Eddystone FAC at ¶ 84).

Defendants entered into a contract with Eddystone while Eddystone was unaware of the financially dependent nature of BTS.[150]

When the oil market began to change in light of newly unfavorable prices, the Eddystone Defendants used their control of BTS to avoid the fallout of remaining in a now-expensive contractual relationship with Eddystone.[151] The Eddystone Defendants developed a plan to "wind down" their oil transport business, which necessarily included escaping their contract with Eddystone.[152] The Eddystone Defendants then exercised their control over BTS and "stripped [it] of assets, including cash flows, and caused BTS to operate as little more than a liability shield for other [Ferrellgas] entities."[153] The Eddystone Defendants' plan involved four steps. First they redirected BTS's revenue stream to other Bridger entities and Ferrellgas itself, leaving BTS without income.[154] Second, the Eddystone Defendants caused BTS to transfer its assets to the Fraudulent Transfer Recipient Subsidiaries for nominal consideration.[155] Third, the Eddystone Defendants did the same with all of BTS's real and personal property.[156] Finally, the

---

[150] *See* A0285 (Eddystone FAC at ¶ 42) ("Defendants held out to Eddystone that BTS was an independent, bona fide company with substantial operations in addition to the RSA."); A0278 (Eddystone FAC at ¶ 9) ("BTS was in fact not the independent bona fide entity that Defendants held out. Contrary to Defendants' holding out of BTS, it was an entirely captive instrument of Defendants, without operational or financial independence.").

[151] *See* A0290 (Eddystone FAC at ¶ 61).

[152] *See* A0290–A0291 (Eddystone FAC at ¶¶ 63–64).

[153] A0291 (Eddystone FAC at ¶ 65).

[154] *See id.*

[155] *See* A0291 (Eddystone FAC at ¶ 66).

[156] *See* A0292 (Eddystone FAC at ¶ 67).

Eddystone Defendants caused BTS to forgive millions of dollars in debts owed to it by debtors, including the Fraudulent Transfer Recipient Subsidiaries.[157]

Once the Eddystone Defendants' plan was complete, and following the sale of BTS to a new Ferrellgas subsidiary for ten dollars, BTS's "only 'asset' was the RSA[.]"[158] A now worthless BTS was nothing more than a "mere tool of Defendants through which they hoped to evade the RSA obligations without cost to [themselves]."[159] Lacking any meaningful assets, BTS ceased payment of the RSA, and predictably breached the agreement in February of 2016.[160]

Eddystone was then in dire straits. "Abruptly cut off from the business on which Eddystone had relied, Eddystone had to suspend operations."[161] Eddystone filed a demand for arbitration with the SMA and was able to reach an agreement whereby BTS consented to an arbitration award for its currently and as-of-yet unpaid invoices under the RSA,[162] but BTS had no funds to pay those invoices. The Eddystone Litigation followed, "a civil proceeding against [the Eddystone Defendants] commenced by the service of a complaint or similar pleading[.]"[163]

---

[157] *See* A0292 (Eddystone FAC at ¶ 68).

[158] A0293 (Eddystone FAC at ¶ 72).

[159] A0292 (Eddystone FAC at ¶ 69).

[160] *See* A0294 (Eddystone FAC at ¶ 74).

[161] *Id.*

[162] *See* A0294 (Eddystone FAC at ¶ 75).

[163] B0294 (MC&L, at Section III.A.2) (emphasis removed).

The four counts of the Eddystone FAC are aimed at creating a fund from which Eddystone could collect the SMA arbitration award or the equivalent consequential damages arising out of the February 2016 breach of the RSA. Each count presents a path for Eddystone to overcome the fact that BTS, allegedly by design, has no assets to compensate them. Count I — Alter Ego against Ferrellgas, Bridger Logistics, Rios, Gamboa, and Bridger Rail Shipping — seeks to pierce the corporate veil under an alter ego theory.[164] If successful on that count, Eddystone would be capable of reaching up the chain and getting at the assets of the listed defendants to compensate themselves for the February 2016 breach of the RSA.[165] Counts II and III, Intentional Fraudulent Transfer[166] and Constructive Fraudulent Transfer,[167] would serve to return BTS's assets so Eddystone could tap them for damages.[168] Count IV — Breach of Fiduciary Duties of Care and Loyalty to Creditors against Ferrellgas, Bridger Logistics, Rios, and Gamboa — seeks to hold the listed parties personally liable for the February 2016 breach.[169] It is evident that the Eddystone Litigation was a claim for the February 2016 breach of the RSA.

---

[164] A0296 (Eddystone FAC at ¶ 86).

[165] *See Manichaean Cap., LLC v. Exela Techs., Inc.*, 251 A.3d 694, 706 (Del. Ch. 2021) ("Plaintiffs . . . provide ample bases to pierce SourceHOV Holdings' corporate veil to reach up the chain to Exela.").

[166] A0296.

[167] A0299.

[168] A0299–A0301 (Eddystone FAC at ¶¶ 98, 101) ("Eddystone is entitled to an order from the Court avoiding the [fraudulent transfers] and requiring Defendants to return the assets to BTS to the extent necessary to satisfy obligations owed to Eddystone, damages in the amount of the value of the transfer, and all relief [sought in the rest of the Eddystone FAC].").

[169] A0301 (Eddystone FAC at ¶ 103).

What is also evident is that substantially all the allegedly wrongful acts from which each count and the putative breach claim arise either occurred in whole or in part after June 24, 2015. The breach itself indisputably occurred in February of 2016,[170] well past June 24, 2015. As Eddystone alleges, the breach was caused by the wrongful acts of Ferrellgas, Bridger Logistics, Rios, and Gamboa, who, using their four-part plan "caused BTS to transfer, without reasonably adequate consideration in exchange, all of its cash, accounts receivable, real and personal property, valuable commercial agreements, and other assets, to [the Fraudulent Transfer Recipient Subsidiaries]."[171] All of the alleged Improper Transfer Acts which fueled this plan occurred between May of 2015 and January of 2016;[172] they comprised an interrelated scheme taking place partially after June 24, 2015, thus triggering the Run-Off Exclusion.

Further, each constituent count is supported by wrongful acts occurring within the Run-Off Exclusion. Counts II and III, Intentional and Constructive Fraudulent Transfer, are supported by the Improper Transfer Acts, which took place between May of 2015 and January of 2016.[173] Count IV relies on Ferrellgas' control over BTS, which took place after the commencement of the Run-Off Exclusion because Ferrellgas' acquisition of Bridger Logistics did not occur until that period began.[174]

---

[170] A0294 (Eddystone FAC at ¶ 74).

[171] A0296–A0297 (Eddystone FAC at ¶ 88).

[172] *See Ferrellgas*, 2020 WL 363677, at *2; *see also* A0291–A0292 (Eddystone FAC at ¶¶ 65–68).

[173] *Id.*

[174] *See* A0300 (Eddystone FAC at ¶ 100).

Count I, Alter Ego, warrants a bit more discussion. Count I, is supported by wrongful acts taking place over the course of the entirety of BTS's and Eddystone's relationship, including during the Run-Off Period. As Zurich points out, "[t]he Eddystone FAC alleges that Bridger Logistics, among others, completely 'dominated BTS in all aspects of its business, directing and controlling its day-to-day operations and treating it like a mere department instead of respecting it as an independent legal entity' both before and after [Ferrellgas]'s acquisition."[175] From the beginning "[Rios and Gamboa] created a series of nominally different companies with the name 'Bridger' to carry on this business, but treated them all as part of an undifferentiated whole."[176] "Bridger Logistics was the sole 'member' of BTS," and thus "owned all of BTS'[s] equity and controlled all of [its] decision-making."[177] This state of affairs is part of the Alter Ego count, and persisted both before and after the Run-Off Date.[178]

---

[175] Answering Br. at 42 (quoting A0294–A0295 (Eddystone FAC at ¶ 77)).

[176] A0282 (Eddystone FAC at ¶ 33).

[177] A0282 (Eddystone FAC at ¶ 34).

[178] *See generally* A0285 (Eddystone FAC at ¶ 42) ("Defendants held out to Eddystone that BTS was an independent, bona fide company with substantial operations in addition to the RSA."); A0286–A0287 (Eddystone FAC at ¶¶ 47, 49) ("Until May 2015, Bridger Logistics affiliates received payments from Monroe under the COSA and paid BTS amounts sufficient to allow BTS to make all of the RSA payments due to Eddystone."); A0289 (Eddystone FAC at ¶ 57) ("From May 2015 onward, Defendants Rios, Gamboa, Bridger Logistics, and [Ferrellgas] re-directed the portions of the Monroe revenue stream that had gone to BTS . . . . From this point forward, BTS was paid nothing for its transloading capacity under the RSA . . . . As long as they needed the capacity to service Monroe and the transportation and logistics agreements, Bridger Logistics, Bridger Rail Shipping, and their non-BTS affiliates continued to fund payments to Eddystone under the RSA by paying Eddystone directly."); A0291 (Eddystone FAC at ¶ 65) ("Between late May 2015 and January 2016, Defendants Rios, Gamboa, Bridger Logistics, and [Ferrellgas] stripped BTS of assets, including cash flows, and caused BTS to operate as little more than a liability shield for other [Ferrellgas] entities.").

Ferrellgas argues that the Alter Ego count seeks relief for the so-called Inducement Acts only and that these wrongful acts stand alone and occurred wholly before the Run-Off Period.[179] Its argument is unavailing. There is no claim for fraudulent inducement and the Alter Ego count is set forth as an avenue to remedy the February 2016 breach as discussed above.

Finally the Prayers for relief in the Eddystone FAC relate specifically to the breach of the RSA.[180] Eddystone sought:

> (1) all payments BTS owes Eddystone under the RSA; (2) the amounts owed pursuant to the arbitration award; (3) expectation damages available to a party injured by breach of contract at common law or by statute; (4) injunctive relief from transfers BTS made to the Fraudulent Transfer Recipient Subsidiaries; (5) damages for the value of the transfers; (6) compensatory damages for economic injury; (7) punitive damages for intentional fraudulent transfer and willful breach of fiduciary duty; and (8) any pre- and post-judgment interest.[181]

Prayers one and three directly pertain to the RSA contract and its breach. Prayer two likewise does, as it seeks to recover the arbitration award arising from the breach of the RSA.[182] The remaining prayers are all in line with the rest of the counts, and, like them, are meant to address the harm caused by the RSA breach.

Ferrellgas' primary rebuttal is that the Eddystone FAC alleges the so-called Inducement Acts, which are a distinct category of events taking place wholly outside of the

---

[179] *See* Opening Br. at 33.

[180] *Ferrellgas*, 2020 WL 363677, at *6.

[181] *Id*. (paraphrasing A0302 (Eddystone FAC "Prayer for Relief" at ¶¶ 1–8)).

[182] *See* A0294 (Eddystone FAC at ¶ 75).

Run-Off Period. The Inducement Acts occurred around the time the RSA was being negotiated, between January of 2013 and April of 2014, and consisted of certain statements in the Eddystone FAC which allege that "Rios, Gamboa, and Bridger Logistics improperly induced Eddystone to enter into the RSA with BTS (and only BTS), which was allegedly not a bona fide entity with sufficient assets to perform under the RSA."[183] Ferrellgas argues that all the Zurich Policy requires for coverage to be warranted is loss resulting from a claim for wrongful acts occurring before the Run-Off Exclusion. Because the Eddystone Litigation is a claim, because it includes allegations for the Inducement Acts, and because the Inducement Acts apparently took place completely before the Run-Off Exclusion, the Eddystone Litigation is a claim for the wrongful acts that are the Inducement Acts.[184]

This argument falls flat because the Zurich Policy is a "claims-made" policy,[185] not an occurrence-based policy. It covered "[l]oss resulting from Claims against the Insureds for Wrongful Acts, not the Wrongful Acts themselves."[186] When read as a whole, the Eddystone FAC advances a claim for relief for the February 2016 breach of the RSA, it does not advance a claim to set aside the RSA on grounds that it was fraudulently induced, reform it as a consequence of any misrepresentation, or recover sums it spent building the transloading facility.[187] Even the allegations in the Eddystone FAC, which Ferrellgas

---

[183] Opening Br. at 33.

[184] *See id*. at 31–33.

[185] *Id.* at 1.

[186] *Bainbridge*, 2006 WL 978880, at *4.

[187] Answering Br. at 40. As counsel for Zurich argued before this Court:

argues comprise the Inducement Acts, are most reasonably understood to be support for the alleged Counts. For example, as hallmarks of the Inducement Acts, Ferrellgas puts forth such allegations from the Eddystone FAC as the fact that Defendants held out to Eddystone that "BTS was an 'independent, bona fide company with substantial operations'" in addition to the RSA;[188] that Bridger Logistics and Rios and Gamboa "'represented that, as of December 31, 2014, BTS had total assets of $98.1 million[;]'"[189] and that Eddystone built the Transloading Facility "in reliance" on those manifestations.[190] Although Ferrellgas contends that these facts would support a fraudulent inducement action, they never asserted one and the only reasonable reading of the Eddystone FAC is that they are intended to support Eddystone's Alter Ego count.

---

**The Court**: Was there actually a fraudulent inducement claim in the underlying complaint?

**Counsel**: There was not. There was not, and it makes sense, they're not trying to void the contract. They're not trying to say we don't want to recover under the rail services agreement, they want to recover under it. What they want to do is recover against somebody other than the shell, other than Bridger Transfer Services. They're trying to bring in the parents with the assets into the case. That's why they make these allegations that we call the Inducement Acts, that's why they have an Alter Ego count, because they want to expand the parties they can collect from. They say, in essence, the fraudulent inducement wasn't inducing me to enter into the contract, the fraudulent inducement was inducing me to enter into the contract with only Bridger Transfer Services, the no asset, completely dependent LLC, so that I basically, if they breach, have no remedy against the real parties at interest, the real counterparties. And that's the gravamen of the complaint.

Oral Argument, at 7:43–8:47, https://vimeo.com/928031761

[188] Opening Br. at 15 (quoting A0285 (Eddystone FAC at ¶ 42)).

[189] *Id.*

[190] Opening Br. at 15 (citing A0284 (Eddystone FAC at ¶ 38) (internal quotation marks omitted)).

Based on the foregoing, it is apparent that the Eddystone Litigation is a claim seeking relief for the February 2016 breach of the RSA. The facts pled in the Eddystone FAC demonstrate that BTS performed under the RSA through January 1, 2016, and that the focal point of the Claim is the February 2016 breach of the RSA, and BTS's inability to pay the arbitration award due to the diversion of assets by BTS's new owners. The overall narrative, nature of counts, and prayer for relief all support this interpretation. Because the breach of the RSA, including all the acts which caused it to happen, occurred either in whole or in part after June 24, 2015, Zurich has no duty to advance defense costs for this matter because of the Run-Off Exclusion. Thus, we AFFIRM the decision of the Superior Court.

### B. The Cross-Appeal — The Ferrellgas Appeal was Timely Filed

On cross appeal, Zurich argues that Ferrellgas' appeal was untimely because it occurred three years after the 2020 Opinion, and over a year after the November 10, 2021 Joint Stipulation between Ferrellgas and Beazley which Zurich contends together constitute a final adjudication of all claims, rights, and liabilities between Zurich and Ferrellgas.[191] Ferrellgas responds that the appeal was, in fact, timely, as it occurred within thirty days of the May 10, 2023 Order which Ferrellgas contends constitutes the final judgment.[192]

---

[191] *See* Answering Br. at 54.

[192] Reply Br. at 29. Ferrellgas also asserts that to the extent Zurich believed that the 2020 Opinion constituted a final decision of the claims between it and Zurich, Zurich did not seek entry of the final judgment under Rule 54(b). *Id*. at 5.

47

Because the 2020 Opinion did not address Count III of the Ferrellgas FAC and only explicitly addressed Counts I and II, and because the Joint Stipulation only resolved matters as to Beazley and not Zurich, there was no final judgment with the entry of the November 10, 2021 Joint Stipulation. Rather, a final judgment was not entered until the Superior Court's May 2023 Order, which expressly addressed Ferrellgas' Motion to Dismiss Count III.

> Under 10 *Del. C.* § 148,
>
> No appeal from a final judgment of the Superior Court in a civil action shall be received or entertained in the Supreme Court unless the praecipe or notice of appeal is duly filed in the office of the Clerk thereof within 30 days after the date of the judgment or decree.[193]

To start the thirty-day countdown of Section 148, a "final judgment" is required. Under Delaware law, a "final judgment" is a judgment that "determines the merits of the controversy or defines the rights of the parties and leaves nothing for future determination or consideration."[194] "When a civil action involves multiple claims and multiple parties, a judgment regarding any claim or any party does not become final until the entry of the last judgment that resolves all claims as to all parties, unless an interlocutory ruling . . . is certified . . . ."[195] In other words, "a final judgment is one that determines all the claims as to all the parties."[196] "The test for whether an order is final and therefore ripe for appeal is

---

[193] 10 *Del. C.* § 148.

[194] *Tyson Foods, Inc. v. Aetos Corp.*, 809 A.2d 575, 579 (Del. 2002).

[195] *Plummer v. R.T. Vanderbilt Co., Inc.*, 49 A.3d 1163, 1167 (Del. 2012) (quoting *Harrison v. Ramunno*, 730 A.2d 653, 653–54 (Del.1999); Super. Ct. Civ. R. 54(b)) (internal quotation marks omitted).

[196] *Tyson Foods*, 809 A.2d at 579.

whether the trial court has clearly declared its intention that the order be the court's 'final act' in a case."[197] Although a party may interpret an order to be a final judgment, "the finality of a court's order is not determined by reservations of the parties to which it applies but by the court itself."[198]

In this case, the 2020 Opinion of the Superior Court made no mention of Count III. Rather, the discussion in the 2020 Opinion centered entirely on Count I (Zurich's Duty to Advance) of the Ferrellgas FAC[199] and Count II of the Ferrellgas FAC (Beazley's Duty to Advance).[200] Considering a final judgment requires that a court "determine[] the merits of the controversy[,]" complete silence as to Count III does not appear to meet that standard.[201]

What is more, in the 2020 Opinion, the Superior Court only explicitly denied "[p]laintiffs' Motion for Partial Summary Judgment on *Count I*, duty to advance defense costs," and dismissed the same.[202] This explicit ruling of denial and dismissal was repeated in the opinion's conclusion,[203] but in neither instance did the 2020 Opinion rule on Count III. The Joint Stipulation between Ferrellgas and Beazley settled matters as between

---

[197] *Id.*; *see also Plummer*, 49 A.3d at 1167.

[198] *Tyson Foods*, 809 A.2d at 581.

[199] *See Ferrellgas*, 2020 WL 363677, at *5–*11 (discussing and interpreting the Zurich Policy, the Run-Off Exclusion, Interrelated Wrongful Acts, and the general scope of the Duty to Advance, all in an effort to determine whether Zurich must advance defense costs).

[200] *See id.* at *11–*14 (discussing and interpreting the Beazley Policy, the Retroactive Date Exclusion, and their effect on Beazley's duty to advance).

[201] *Tyson Foods*, 809 A.2d at 579.

[202] *Ferrellgas*, 2020 WL 363677, at *10 (emphasis added).

[203] *Id.* at *13.

Ferrellgas and Beazley only.[204]  Thus, Count III was unresolved.  The fact that the 2020 Opinion and 2021 Joint Stipulation did not address Count III with any specific finality undercuts the claim of finality.  Rather, a final judgment occurred upon entry of the 2023 Order on the Ferrellgas MTD which explicitly and unequivocally dismissed Count III and entered final judgment in the matter.[205]

Zurich points out that the 2020 Opinion stated that "the Eddystone Litigation is excluded from the Zurich Policy coverage[,]"[206] and that this left nothing for future determination between Ferrellgas and Zurich.[207]  Although, as a practical matter, such language suggests how Count III likely would be determined, the fact that it was couched in an analysis and finding regarding Count I which makes no reference to Count III, nonetheless, suggests that it does not constitute a clear declaration of a final act with respect to Count III.  Further, as Ferrellgas points out, indemnification claims are resolved after resolution of the underlying litigation — here, the Eddystone Litigation — which at the time of oral argument before this Court was still pending.  For these reasons, Zurich's counter argument fails.

---

[204] *See* B0836–B0837 (Stipulation of Dismissal as to Beazley Ins. Co., Inc. dated Nov. 10, 2021) (providing that the parties agree "that the above-captioned action be dismissed as to Beazley only . . . .").

[205] B0892 (Order Entering Judgment) ("Count III of the Amended Complaint is hereby voluntarily dismissed . . . .  Final Judgment is hereby entered in this action").  *See also Tyson Foods*, 809 A.2d at 581 ("When the trial court intends for its order to resolve all outstanding issues, and says so, its order is final.").

[206] *Ferrellgas*, 2020 WL 363677, at *13.

[207] *See* Answering Br. at 55.

50

Therefore, the Superior Court's 2020 Opinion, and the Joint Stipulation between Beazley and Ferrellgas did not constitute a final judgment respecting Ferrellgas' action. Such a final judgment did not occur until May 10, 2023, with the Superior Court's Order dismissing Count III and explicitly entering final judgment. Ferrellgas filed its appeal with this Court fifteen days later, on May 25, 2023, and, therefore, its appeal was timely.

*IV. CONCLUSION*

For the reasons set forth above, we AFFIRM the judgments of the Superior Court set forth in its 2020 Opinion and in its May 10, 2023 Order and Final Judgment.

51